134 Nev., Advance Opinion 27

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| JOHN DEMON MORGAN,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 70424<br><br>**FILED**<br><br>MAY 03 2018<br><br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY_____<br>CHIEF DEPUTY CLERK |

Appeal from a judgment of conviction, pursuant to a jury verdict, of robbery and misdemeanor battery. Eighth Judicial District Court, Clark County; Susan Johnson, Judge.

*Affirmed*.

Howard Brooks, Public Defender, and Sharon G. Dickinson, Deputy Public Defender, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Krista D. Barrie, Chief Deputy District Attorney, Clark County,
for Respondent.

BEFORE DOUGLAS, C.J., GIBBONS and PICKERING, JJ.

*OPINION*

By the Court, DOUGLAS, C.J.:

In this appeal, we consider whether the district court made multiple errors from the time it held the competency hearing for appellant John Demon Morgan to when it entered a judgment of conviction. In particular, after first considering whether the district court erred with respect to Morgan's competency hearing, we consider whether the delay in

18 - 16757

Morgan's subsequent transfer to a psychiatric facility for the purpose of restoring competency to stand trial warranted dismissal of the charges. Next, we consider whether the district court erred with respect to jury selection and closing arguments. Finally, we consider whether there was sufficient evidence for Morgan's conviction. We conclude that the district court did not commit any error during the time frame at issue and there was sufficient evidence for Morgan's conviction.[1] Furthermore, with respect to jury selection, although the district court properly overruled Morgan's challenge to the State's strike of a prospective juror, we take this opportunity to hold that striking a prospective juror based on sexual orientation is impermissible under the United States and Nevada Constitutions. Accordingly, we affirm Morgan's conviction.

## FACTS AND PROCEDURAL HISTORY

On October 30, 2014, Maria Verduzco was working as a manager at an AM/PM convenience store when she saw a man grab a package of mixed nuts and put them into his pocket. Maria approached the man while he was at the checkout counter trying to pay for another item and asked him if he could please take out what he had placed into his pocket. The man told Maria to "get the f _ _ _ out of [his] face," and as she backed up in response, he approached and hit her in the chest.[2] Maria fell to the ground, got up, and hit the man's backpack with a stick as he left the store. The man's backpack ripped and containers of soup fell out. Maria

---

[1]As there are no errors to cumulate, Morgan's argument that cumulative error warrants reversal lacks merit.

[2]Such action was depicted in the surveillance video, and Morgan admitted to this action in his opening statement.

called the police and indicated where the man departed. Police detained the man and identified him as Morgan. The State then charged Morgan by way of criminal complaint and information with one count of robbery and one count of battery with intent to commit a crime.

On December 1, 2014, Morgan was removed from his initial arraignment hearing for spitting, and a competency hearing was set for later that month. However, because the two court-appointed competency examiners reached opposite conclusions, the district court ordered a third evaluation and continued the competency hearing. After the third examiner found Morgan competent, he challenged his competency by requesting another hearing.

In February 2015, at the competency hearing, Morgan called only one witness to testify—the single examiner who had found him incompetent. Although the other two examiners who had found Morgan competent did not testify at the hearing, neither Morgan nor his counsel requested their presence. The district court relied on the evaluations from the two court-appointed examiners who were not present at the hearing to find Morgan competent to proceed with trial proceedings.

Thereafter, Morgan pleaded not guilty to both counts. Morgan's counsel subsequently requested another competency evaluation, and thus, the matter was sent back to competency court. Because two examiners then found Morgan incompetent to proceed with adjudication, the district court ordered that he be transferred to Lake's Crossing Center for the purposes of treatment and restoring competency to stand trial.

While waiting over 100 days in the Clark County Detention Center for his scheduled transfer to Lake's Crossing Center, Morgan filed a motion to dismiss due to the delay of his transfer. The district court denied

his motion, despite the fact that all agreed that the time frame to transfer Morgan to Lake's Crossing Center had not been met.

In February 2016, a three-day trial ensued. During jury selection, Morgan moved to strike the jury venire and requested an evidentiary hearing because there were only 3 African-Americans in the 45-person venire. The district court denied Morgan's motion. Morgan renewed his motion for an evidentiary hearing after the district court discovered that one of the African-American veniremembers was ineligible to serve on the jury. The district court initially denied Morgan's renewed motion but subsequently held a hearing to determine the merits of his motion, and the district court again denied Morgan's motion.

In conducting voir dire, the district court explained that it would first ask the jury panel general questions before the parties could request to strike jurors for cause. The district court further explained that it would then seat 13 of the remaining individuals from this panel inside the jury box and the parties would take turns asking questions. If both parties passed for cause after questioning, a party could chose to exercise a peremptory challenge on their turn. However, the district court stated that the parties would lose their peremptory challenge if they decided not to use it. Morgan opposed this "use or lose" method of exercising peremptory challenges, to no avail. Subsequently, the State used a peremptory challenge to strike juror no. 24, one of the two identifiable gay veniremembers.[3] Morgan challenged the State's strike based on sexual

---

[3]Juror no. 24 revealed his sexual orientation by answering, "[h]e's an artist," after the State inquired about his partner's employment. Juror no. 11 replied to the State's same inquiry by answering, "[h]e is the head of props for a Broadway show in New York."

orientation because the State asked juror no. 24 whether he said "boyfriend, girlfriend or married," in response to the juror's reply when asked about relationship status. The State justified its strike by explaining that juror no. 24 expressed an approval of the media's criticism towards police. Morgan contended that other jurors shared the same view on police criticism in the media, but that these individuals served on the jury because they were heterosexual. The district court, however, denied Morgan's challenge.

In the opening statements, Morgan asked the jury to find him guilty of misdemeanor battery only, but not robbery. The defense theory was that, although Morgan inexcusably hit Maria, he had no intent to rob the convenience store because he tried to pay. During closing arguments, the district court required Morgan to correct his statement that Maria was still a manager at the AM/PM convenience store because of the lack of evidence validating his statement of fact.

Ultimately, the jury found Morgan guilty of robbery and misdemeanor battery. The district court sentenced Morgan to serve his two counts concurrently for a maximum of 120 months with a minimum parole eligibility of 26 months and 533 days' credit for time served. Morgan now appeals.

## DISCUSSION

*The district court did not err with respect to Morgan's competency hearing*

Morgan contends that the district court violated his constitutional right to due process and his statutory right to cross-examine the two examiners who had initially found him competent.[4] We disagree.

---

[4]Morgan also asserts a violation of his Sixth Amendment right to cross-examination. However, he fails to provide relevant authority. *See*

We point out that the district court subsequently found Morgan incompetent prior to trial and conviction, as he desired, and we further conclude that because Morgan failed to object below, the court-appointed competency examiners were not required to testify at the competency hearing.

Because Morgan never objected at his competency hearing that the two examiners who had found him competent were not present, we review the alleged error for plain error. *See Calvin v. State*, 122 Nev. 1178, 1184, 147 P.3d 1097, 1101 (2006) (stating that failure to object to the exclusion of witness testimony at a competency hearing elicits plain error review).

"In conducting a plain-error analysis, we must consider whether error exists, if the error was plain or clear, and if the error affected the defendant's substantial rights." *Id.* at 1184, 147 P.3d at 1101. In considering whether error exists, "[i]t is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Olivares v. State*, 124 Nev. 1142, 1147, 195 P.3d 864, 868 (2008) (internal quotation marks omitted).

Nevada has provided that "[i]f the court finds that further competency proceedings are warranted, it 'shall appoint two [certified] psychiatrists, two psychologists, or one psychiatrist and one psychologist, to examine the defendant.'" *Scarbo v. Eighth Judicial Dist. Court*, 125 Nev.

---

*Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) ("It is appellant's responsibility to present relevant authority and cogent argument; issues not so presented need not be addressed by this court.").

118, 122, 206 P.3d 975, 978 (2009) (quoting NRS 178.415(1)).[5] Following the completion of the examinations, "at a hearing in open court, the court that orders the examination must receive the report of the examination." *Id.* at 123, 206 P.3d at 978 (quoting NRS 178.415(2)). After the court receives the reports of the examinations, it "shall permit counsel for both sides to examine the person or persons appointed to examine the defendant." *Id.* (quoting NRS 178.415(3)). This requirement "does not compel the participation of the court-appointed competency examiners at the competency hearing." *Id.* at 123 n.5, 206 P.3d at 978 n.5. However, the parties may subpoena the court-appointed examiners to require their appearance at the competency hearing. *See id.* Moreover, "[b]y providing counsel for both sides with full and complete copies of the competence examination reports [prior to the competency hearing], the prosecuting attorney and the defense counsel will be afforded a meaningful opportunity to be heard during the competency hearing." *Id.* at 125, 206 P.3d at 979. At the competency hearing, "[t]he court shall [ ] permit counsel to introduce other evidence and cross-examine one another's witnesses." *Id.* at 123, 206 P.3d at 978 (citing NRS 178.415(3)). Finally, "[the court] shall enter its finding as to competence." *Id.* (citing NRS 178.415(4)).

Here, plain error does not exist because under *Scarbo*, neither Morgan nor the State subpoenaed the two court-appointed examiners who had initially found him competent, and thus, their presence at the competency hearing was not required. As a result, the court could only

---

[5]The Legislature revised NRS 178.415 substantially in 2017. *See* 2017 Nev. Rev. Stat., ch. 480, § 1 at 2996. However, because Morgan committed his crimes in 2014, we address the version of the statute in place at that time.

permit Morgan's counsel to cross-examine the witnesses present at the hearing. Moreover, defense counsel received the examination reports prior to the competency hearing, affording Morgan due process and the opportunity to subpoena the examiners, if he so desired. Therefore, the district court did not err with respect to Morgan's competency hearing.

*The district court did not err by rejecting Morgan's motion to dismiss the charges*

In Morgan's motion to dismiss, he relied upon a proposed consent decree, order, and judgment that the United States District Court for the District of Nevada approved, involving a federal civil action filed by three Clark County Detention Center inmates (collectively, plaintiffs) against the administrator of the Nevada Division of Public and Behavioral Health, the director of Lake's Crossing Center, and the director of the Nevada Department of Health and Human Resources (collectively, defendants). *See Burnside v. Whitley*, No. 2:13-CV-01102-MMD-GWF (D. Nev. Jan. 28, 2014). The plaintiffs alleged that the defendants failed to provide court-ordered treatment to incompetent criminal defendants, in violation of the Due Process Clause of the Fourteenth Amendment. Because the parties agreed to resolve the lawsuit, the court issued an order pursuant to the parties' agreed-upon terms. Pursuant to the federal order, the defendants were to transport incompetent detainees for competency treatment within 7 days of receiving a court order. Here, Morgan argued that because he waited over 100 days for his transfer to Lake's Crossing Center, violation of the federal order warranted dismissal of the charges against him. However, the district court found that it was necessary to balance the interests of Morgan, whom the examiners deemed to be a danger to himself and to society, with the interests of the community. Thus, the district court found dismissal to be an extreme remedy. Instead, the

district court determined that the proper remedy was to order compliance with the federal order and order Morgan's transfer to Lake's Crossing Center within 7 days, and it ultimately denied Morgan's motion.

Morgan argues that the district court erred in denying his motion to dismiss the charges due to the length of delay in transporting him to Lake's Crossing Center, in violation of a federal court order and his right to due process. We disagree and conclude that the delay in Morgan's transfer to Lake's Crossing Center did not require dismissal of the charges.

This court will not disturb a district court's decision on whether to dismiss a charging document absent an abuse of discretion. *See Hill v. State*, 124 Nev. 546, 550, 188 P.3d 51, 54 (2008) (reviewing the dismissal of an indictment). Dismissal is an extreme sanction; however, "dismissal with prejudice at the state level is most appropriate upon a finding of aggravated circumstances and only after a balancing of its deterrent objectives with the interest of society in prosecuting those who violate its laws." *State v. Babayan*, 106 Nev. 155, 173, 787 P.2d 805, 817, 818 (1990) (emphasis omitted).

After balancing deterrent objectives with society's interest in prosecuting criminals, pursuant to *Babayan*, it follows that a violation of the federal order by those who are not parties to the case at hand did not amount to aggravated circumstances warranting the extreme sanction of

 

dismissing Morgan's charges.[6]  Therefore, the district court did not abuse its discretion in denying Morgan's motion to dismiss the charges.[7]

*The district court did not err with respect to jury selection*

Morgan contends that: (1) the district court committed structural error when it allegedly made a ruling on his motion to strike the jury venire before conducting an evidentiary hearing, (2) he was entitled to a new venire, (3) the district court abused its discretion in determining the manner in which voir dire was conducted, and (4) the district court erred in overruling his *Batson* challenge.[8]  We disagree with each of Morgan's contentions in turn.

---

[6]In addition to the federal order, Morgan also relied upon distinguishable cases inapplicable to his case, and he now alternatively argues for the first time on appeal, without providing any relevant authority, that he should be awarded 10 days' credit for each day over 7 that he remained in confinement.  We decline to address this issue.  *See State v. Powell*, 122 Nev. 751, 756, 138 P.3d 453, 456 (2006) ("Generally, failure to raise an issue below bars consideration on appeal." (internal quotation marks omitted)); *Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) ("It is appellant's responsibility to present relevant authority and cogent argument; issues not so present need not be addressed by this court.").

[7]After considering Morgan's argument that the State's information was impermissibly vague and violated his Sixth Amendment right to be informed of his charges, we conclude that the information adequately notified Morgan of the charges he was expected to defend, and thus, the district court did not abuse its discretion in denying his motion to dismiss the charges or alternatively plead particular facts.  *See Hill v. State*, 124 Nev. 546, 550, 188 P.3d 51, 54 (2008) (stating that this court will not disturb a district court's decision on whether to dismiss a charging document absent an abuse of discretion).

[8]Morgan additionally contends that the district court made statements during voir dire that denied him the presumption of innocence. *See Watters v. State*, 129 Nev. 886, 889, 313 P.3d 243, 246 (2013) ("The

Supreme Court
OF
Nevada

(O) 1947A

10

*The district court did not commit structural error when Morgan moved to strike the jury venire*

Morgan argues that the district court committed structural error when he moved to strike the jury venire, which mandates reversal of his conviction under *Buchanan v. State*, 130 Nev. 829, 335 P.3d 207 (2014). We disagree.

This court reviews de novo whether the district court's actions constituted structural error. *See Barral v. State*, 131 Nev. 520, 523, 353 P.3d 1197, 1198 (2015). This court has held that "when a defendant moves the court to strike a jury venire, and the district court determines that an evidentiary hearing is warranted, it is structural error for the district court to deny the defendant's challenge before holding that hearing to determine the merits of the motion." *Buchanan*, 130 Nev. at 833, 335 P.3d at 210.

Here, the district court's actions did not violate *Buchanan*. The court initially denied Morgan's first challenge to the jury panel and request for a hearing because it believed that the veniremembers were randomly

---

presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." (internal quotation marks omitted)); *see also* NRS 175.201 (providing that a criminal defendant is presumed innocent until the State proves otherwise beyond a reasonable doubt). The record demonstrates that the district court instructed the jury on the proper presumption of innocence and burden of proof shortly after the alleged error occurred. Further, after the jury was empaneled, the district court again correctly instructed the jury on the proper presumption of innocence. Finally, at the conclusion of trial, the jury was given the correct instructions on the burden of proof and the presumption of innocence. Because the district court properly instructed the jury, and no evidence indicated that the jury ignored its instructions, Morgan was not denied the presumption of innocence. *See Leonard v. State*, 117 Nev. 53, 66, 17 P.3d 397, 405 (2001) ("A jury is presumed to follow its instructions." (internal quotation marks omitted)).

 

chosen. Morgan renewed his motion for a hearing a few hours later because one of the three African-American veniremembers was not eligible to serve on the jury. Initially, the district court denied Morgan's renewed motion, but after the State brought the method by which the jury commissioner selects potential jurors to the district court's attention and Morgan stated that he would like to have a hearing with the jury commissioner to determine how the jury panels are assembled, the district court decided to allow the jury commissioner to testify in order to resolve the issue. The district court set the matter for hearing despite the fact that it knew that the jury commissioner did not inquire about race, creed, or color. After a hearing on the merits, the district court once again denied Morgan's motion to disqualify the jury panel. Based on the district court's actions, the district court met the requirements set forth in *Buchanan*, and thus, did not commit structural error warranting reversal.

*Morgan was not entitled to a new venire*

Morgan argues that he was entitled to a new venire because: (1) African-Americans are a distinctive group, (2) African-Americans were not fairly represented in the venire, and (3) the underrepresentation of African-Americans was due to systematic exclusion. In particular, Morgan argues that because 11.8% of Clark County residents are African-American,[9] the 45-person venire should have included at least 5 African-Americans, not 3. Although we agree that African-Americans are a distinctive group, we disagree with Morgan's remaining contentions.

---

[9]The State does not challenge the accuracy of this percentage obtained from the United States Census Bureau.

The Sixth and Fourteenth Amendments of the United States Constitution guarantee "a venire selected from a fair cross section of the community." *Williams v. State*, 121 Nev. 934, 939, 125 P.3d 627, 631 (2005).

> To demonstrate a prima facie violation of the fair-cross-section requirement, the defendant must show:
>
> > (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 940, 125 P.3d at 631 (internal quotation marks and emphases omitted).

Under the first prong, the parties correctly agree that African-Americans are a distinctive group in the community. *See id.* Accordingly, we address the remaining contested prongs.

Under the second prong, to determine whether the representation of African-Americans in the venire is fair and reasonable, this court calculates the absolute and comparative disparities.[10] *See Evans v. State*, 112 Nev. 1172, 1187, 926 P.2d 265, 275 (1996) (stating that "a comparative disparity well below 50% is unlikely to be sufficient [to show

---

[10]"Unlike the absolute disparity, the comparative disparity takes into account the size of the group in addition to the absolute difference between the group's proportionate representation in the community and its representation in the jury pool." *Evans v. State*, 112 Nev. 1172, 1187 n.15, 926 P.2d 265, 275 n.15 (1996).

SUPREME COURT
OF
NEVADA

(O) 1947A

underrepresentation]" (citing *State v. Lopez*, 692 P.2d 370, 377 (Idaho Ct. App. 1984) (holding that "a comparative disparity well over 50% is strong evidence of underrepresentation" and "[a] comparative disparity of about 50% may or may not be adequate to show such underrepresentation, depending in part upon the size of the group in question," and concluding that an absolute disparity of 5% and comparative disparity of 61%, taken together, were sufficient to show that the underrepresentation in the venire was not fair or reasonable) (internal quotation marks omitted))). Here, African-Americans comprised of 6.7% of the 45-person venire. This mathematically results in an absolute disparity of 5.1% and a comparative disparity of 43.2%.[11] Therefore, the given disparities here fail to sufficiently show underrepresentation. Because the second prong proves fatal for Morgan, analysis of the third prong is unnecessary. Based on the foregoing, Morgan failed to demonstrate a prima facie violation of his Sixth Amendment right to a venire composed of a fair cross section of the community, and thus, Morgan was not entitled to a new venire.

*The district court did not abuse its discretion in determining the manner in which voir dire was conducted*

The district court explained to the parties how it would conduct voir dire. First, the district court would ask the jury panel 20 basic questions. The parties could then request to strike jurors for cause. After removing jurors for cause, the district court would seat 13 individuals inside the jury box. Once the 13 individuals were seated, the State would have the opportunity to ask its questions. Then the defense would have its turn to ask its questions. Once the defense concluded its questions, the parties would approach the bench and the district court would ask whether they

[11]Morgan miscalculates the comparative disparity to be 56.4%.

passed the prospective jurors for cause. If any individuals were excused for cause, their open seats would be filled with a new prospective juror. The next round of questioning would then begin. If both the State and the defense passed for cause, the district court would ask the State for its peremptory challenge. Each side would have four peremptory challenges, and one for the alternate juror. If the State chose to exercise its first peremptory challenge and the juror was excused, that juror's seat would be filled by the next juror in the venire. Each party's opportunity to use a peremptory challenge would alternate, but if a party waived the peremptory challenge on their turn, they would lose it.

Morgan opposed the district court's "use or lose" method of peremptory challenges by arguing that he should be allowed to exercise all of his peremptory challenges on the worst prospective jurors, although he conceded that multiple courts utilize this use or lose method. Morgan relied on *Gyger v. Sunrise Hospital & Medical Center, LLC*, Docket No. 58972 (Order of Affirmance, December 18, 2013), an unpublished civil order, to support his position that it is error to require a party to exercise a peremptory challenge without knowing the next juror in the pool. In response to Morgan's opposition, the district court stated that he should pay attention to the 20 questions it would ask.

Morgan asserts that the district court unreasonably restricted his use of peremptory challenges during voir dire by requiring the parties to use or lose such challenges before qualifying 23 potential jurors.[12] We

---

[12]Morgan additionally argues that in rejecting several questions he posed in voir dire, the district court denied his right to effective assistance of counsel and due process and, thus, the district court placed unreasonable restrictions on the scope of voir dire. "The court shall conduct the initial

disagree and conclude that the district court did not abuse its discretion in determining the manner in which voir dire was conducted, as *Gyger* is distinguishable from this case.

"[T]he scope of voir dire and the method by which voir dire is pursued are within the discretion of the district court." *Salazar v. State*, 107 Nev. at 985, 823 P.2d at 274 (internal citations and quotation marks omitted). "If the offense charged is punishable by imprisonment . . . , each side is entitled to four peremptory challenges." NRS 175.051(2). "The State and the defendant shall exercise their challenges alternatively, in that order. Any challenge not exercised in its proper order is waived." NRS 175.051(3). Further, each side is entitled to one peremptory challenge for an alternate juror. NRS 175.061(5). In examining prospective jurors, NRS 16.030(4) is illustrative:[13]

> The persons whose names are called must be examined as to their qualifications to serve as jurors. If any persons on the panel are excused for cause, they must be replaced by additional persons who must also be examined as to their

examination of prospective jurors, and defendant or the defendant's attorney and the district attorney are entitled to supplement the examination by such further inquiry as the court deems proper. Any supplemental examination must not be unreasonably restricted." NRS 175.031. We conclude that the district court did not unreasonably restrict the scope of Morgan's supplemental examination during voir dire and, thus, did not abuse its discretion because review of the record reveals that although the district court rejected several questions Morgan posed, he was still able to exercise the line of questioning on other occasions during voir dire. *See Salazar v. State*, 107 Nev. 982, 985, 823 P.2d 273, 274 (1991) (stating that we review the scope of voir dire for an abuse of discretion).

[13]Although this statute pertains to trial by jury in civil practice, "[t]rial juries for criminal actions are formed in the same manner as trial juries in civil actions." NRS 175.021(1).

SUPREME COURT
OF
NEVADA

(O) 1947A

16

qualifications . . . . When a sufficient number of prospective jurors has been qualified to complete the panel, each side shall exercise its peremptory challenges out of the hearing of the panel by alternately striking names from the list of persons on the panel. After the peremptory challenges have been exercised, the persons remaining on the panel who are needed to complete the jury shall, in the order in which their names were drawn, be regular jurors or alternate jurors.

Here, the court examined the 45-person panel of prospective jurors as to their qualifications by asking 20 general questions before excusing 5 jurors for cause. This occurred prior to seating 13 individuals inside the jury box. Thus, only qualified individuals were selected to sit in the jury box, and the court replaced any juror who was removed with another who was also previously qualified. Further, the court agreed to ask certain questions that the parties requested before each side was allowed to individually voir dire the remaining panel members. Therefore, the district court did not unreasonably restrict supplemental examination and, thus, did not abuse its discretion by employing the use or lose method of peremptory challenges.

Moreover, *Gyger*, the unpublished civil order Morgan relied on below, is distinguishable from this case. In *Gyger*, the district court sat the 12 prospective jurors in the jury box *before* voir dire examination began. Thus, when the court would replace an excused juror, the district court would first question the newly seated juror before counsel would begin their questioning. This court concluded that the use or lose method of peremptory challenges the district court employed unreasonably restricted the voir dire process because "[t]he purpose of voir dire is to ensure that a fair and impartial jury is seated and the voir dire process used in this case worked directly against this purpose by forcing the parties' attorneys to guess about

the comparative fairness of potential jurors who were not yet seated." (Internal citation omitted.) Although *Gyger* and the case at hand employed the same use or lose method of peremptory challenges, employing this method *after* the court conducts its initial examination of prospective jurors sets this case apart from *Gyger*. Therefore, in rejecting the application of *Gyger* in the instant case, and employing its chosen method of voir dire, the district court did not abuse its discretion.

*The district court properly overruled Morgan's Batson challenge*

The State used its second peremptory challenge to strike prospective juror no. 24, an identifiably gay member. Morgan made a *Batson* challenge against the State's strike based on sexual orientation. Although the district court never made a finding as to whether Morgan made out a prima face case of discrimination, it denied Morgan's challenge.[14] Before addressing Morgan's contention that the district court erred in overruling his *Batson* challenge based on sexual orientation, we take this opportunity to first address whether sexual orientation should be recognized under *Batson*—a novel issue before this court. In answering in the affirmative, we align this court with the Ninth Circuit.

"[T]he use of peremptory challenges to remove potential jurors on the basis of race is unconstitutional under the Equal Protection Clause

---

[14]Morgan contends that the district court prejudged his *Batson* challenge and that this amounted to structural error under *Brass v. State*, 128 Nev. 748, 291 P.3d 145 (2012). However, we conclude that Morgan's contention lacks merit because he concedes that the *Batson* hearing occurred prior to removing prospective juror no. 24. *See Brass*, 128 Nev. at 750, 291 P.3d at 147 (holding "that when a defendant asserts a *Batson* violation, it is structural error to dismiss the challenged juror prior to conducting the *Batson* hearing because it shows that the district court predetermined the challenge before actually hearing it").

 

of the United States Constitution." *Diomampo v. State*, 124 Nev. 414, 422, 185 P.3d 1031, 1036 (2008) (citing *Batson v. Kentucky*, 476 U.S. 79, 86 (1986)). The scope of *Batson* has been expanded "to prohibit striking jurors solely on account of gender." *Watson v. State*, 130 Nev. 764, 774, 335 P.3d 157, 165 (2014) (citing *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140-43 (1994)). Although the United States Supreme Court has yet to address whether *Batson* extends to sexual orientation, the United States Court of Appeals for the Ninth Circuit concluded in the affirmative. *See SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 486 (9th Cir. 2014). In reaching its decision, the Ninth Circuit first established that classifications based on sexual orientation are subject to heightened scrutiny, and the court further concluded that equal protection prohibited striking a juror on this basis. *Id.* at 484. The court elucidated how "[g]ays and lesbians have been systematically excluded from the most important institutions of self-governance." *Id.* Moreover, "[s]trikes exercised on the basis of sexual orientation continue this deplorable tradition of treating gays and lesbians as underserving of participation in our nation's most cherished rites and rituals." *Id.* at 485. Such strikes "deprive individuals of the opportunity to participate in perfecting democracy and guarding our ideals of justice on account of a characteristic that has nothing to do with their fitness to serve." *Id.* In sum, "[t]he history of exclusion of gays and lesbians from democratic institutions and the pervasiveness of stereotypes [led] [the Ninth Circuit] to conclude that *Batson* applies to peremptory strikes based on sexual orientation." *Id.* at 486. We take this opportunity to adopt *SmithKline*'s holding and expand *Batson* to sexual orientation.

In addressing whether the district court erred in overruling Morgan's *Batson* challenge based on sexual orientation, "the trial court's

SUPREME COURT
OF
NEVADA

(O) 1947A

19

decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Diomampo*, 124 Nev. at 422-23, 185 P.3d at 1036-37 (internal quotation marks omitted). Thus, "we will not reverse the district court's decision unless clearly erroneous." *Watson*, 130 Nev. at 775, 335 P.3d at 165 (internal citation and quotation marks omitted).

"We evaluate an equal-protection challenge to the exercise of a peremptory challenge using the three-step analysis set forth by the United States Supreme Court in *Batson*." *Id.* at 774, 335 P.3d at 165. Accordingly, this court engages in the following analysis:

> (1) the opponent of the peremptory challenge must make out a prima facie case of discrimination, (2) the production burden then shifts to the proponent of the challenge to assert a neutral explanation for the challenge, and (3) the trial court must then decide whether the opponent of the challenge has proved purposeful discrimination.

*Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006).

In establishing a prima facie case of discrimination under the first step of the *Batson* analysis, "the opponent of the strike must show that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Watson*, 130 Nev. at 775, 335 P.3d at 166 (internal quotation marks omitted). This step is not onerous and "the opponent of a strike is not required to establish a pattern of strikes against members of the targeted group." *Id.* (emphasis omitted). However, "[w]here there is no pattern of strikes against members of the targeted group to give rise to an inference of discrimination, the opponent of the strike must provide other evidence sufficient to permit an inference of discrimination based on membership in the targeted group." *Id.* at 776, 335 P.3d at 166. Thus, the opponent of the strike must provide "something more" to satisfy the first

Supreme Court
of
Nevada

(O) 1947A

step. *Id.* (internal quotation marks omitted). For example, "circumstances that might support an inference of discrimination include, but are not limited to, the disproportionate effect of peremptory strikes, the nature of the proponent's questions and statements during voir dire, disparate treatment of members of the targeted group, and whether the case itself is sensitive to bias." *Id.* at 776, 335 P.3d at 167. To successfully establish a prima facie case of discrimination based on sexual orientation, the opponent of the strike may produce evidence that "[the prospective juror] was the only juror to have identified himself as gay on the record, and the subject matter of the litigation presented an issue of consequence to the gay community." *SmithKline*, 740 F.3d at 476. However, even though striking one or two gay individuals "may not always constitute a prima facie case, it is preferable for the court to err on the side of the defendant's rights to a fair and impartial jury." *Id.* (internal quotation marks omitted).

Here, juror no. 24 was not the only juror to have identified himself as gay on the record. The State did not use a peremptory strike against the other identifiable gay member, and thus, this individual served on the jury. Accordingly, there is no pattern of strikes against gay members, no disproportionate effect of peremptory strikes, and no disparate treatment of gay members. With regard to the nature of the State's questions and statements during voir dire, although the prosecutor inquired about juror no. 24's relationship status by asking him whether he said "boyfriend, girlfriend or married," which prompted juror no. 24 to answer "partner," the prosecutor intended to inquire about his marital status and not his sexual orientation, despite not phrasing the question as "married, single, [or] divorced," as the prosecutor did with other prospective jurors. Finally, the nature of Morgan's criminal case did not involve an issue

 

sensitive to the gay community. Therefore, because we are not convinced that the totality of the circumstances gave rise to an inference of discrimination, Morgan failed to make out a prima face case of discrimination.

Further, the State, as the proponent of the peremptory challenge, provided a neutral explanation for the challenge that proved it did not engage in purposeful discrimination. After the State asserts a neutral explanation for its peremptory challenge, "the defendant bears a heavy burden in demonstrating that the State's facially [ ]neutral explanation is pretext for discrimination." *Conner v. State*, 130 Nev. 457, 464, 327 P.3d 503, 509 (2014). Thus, "to carry that burden, the defendant *must* offer some analysis of the relevant considerations which is sufficient to demonstrate that it is more likely than not that the State engaged in purposeful discrimination." *Id.* Relevant considerations include, "(1) the similarity of answers to voir dire questions given by veniremembers who were struck by the prosecutor and answers by those veniremembers of another [sexual orientation] who remained in the venire," and "(2) the disparate questioning by the prosecutors of struck veniremembers and those veniremembers of another [sexual orientation] who remained in the venire." *Id.* Additionally, "[a]n implausible or fantastic justification by the State may, and probably will, be found to be pretext for intentional discrimination." *Id.* (internal quotation marks omitted). "The court should evaluate all the evidence introduced by each side on the issue of whether [sexual orientation] was the real reason for the challenge and then address whether the defendant has met his burden of persuasion." *Kaczmarek v. State*, 120 Nev. 314, 334, 91 P.3d 16, 30 (2004).



Here, the prosecutor provided the district court with a neutral explanation for striking prospective juror no. 24. The State contended that juror no. 24's response during voir dire indicated an approval of the media's criticism of the police, because after the prosecutor asked who had strong feelings about the criticism of police officers portrayed in the media, juror no. 24 responded that he felt "that it's about time that the police officers . . . are being charged" and that he thought "it's gone on way too long that [the police officers have] been able to abuse the public." In response to the State's neutral reason for striking prospective juror no. 24, Morgan argued that the State's reason was pretextual because prospective juror no. 27 shared a similar view concerning police criticism in the media, but he was heterosexual and served on the jury.[15] The district court overruled Morgan's *Batson* challenge after it determined that the State had reason to strike juror no. 24, and after it discredited Morgan's argument that sexual orientation was the real reason for the strike.

On appeal, Morgan additionally argues that heterosexual prospective juror no. 31 similarly expressed concern about police in the media but served on the jury. Thus, Morgan contends that the State's justification was implausible. The record reflects that prospective juror no. 24 had a stronger opinion on police criticism than prospective juror nos. 27 and 31, and thus, juror no. 24 provided a dissimilar answer when compared to the heterosexual veniremembers who served on the jury. Moreover, review of the record indicates that the State asked the other identifiable gay veniremember who served on the jury whether he was "married, single, [or] divorced," instead of phrasing the question "boyfriend, girlfriend or

---

[15]For this reason, Morgan's argument that the court showed judicial bias by not allowing him to counter the State's neutral reason fails.

SUPREME COURT
OF
NEVADA

(O) 1947A

married," and thus, the State did not engage in disparate questioning. Therefore, Morgan failed to demonstrate that the State's neutral explanation for striking prospective juror no. 24 was pretextual. Accordingly, the district court properly overruled Morgan's *Batson* challenge.[16]

*The district court did not err with respect to closing arguments*

In Morgan's closing argument, his counsel stated: "What else did we hear during this trial? Maria Verduzco is still a manager at the AM/PM . . . ." The district court sustained the State's objection because evidence was not produced at trial that Maria was still the manager at the convenience store. Accordingly, upon the district court's instruction, Morgan corrected his previous statement to the jury.

Morgan argues that his constitutional rights to effective assistance of counsel were denied when the court demanded that his counsel correct the alleged misstatement.[17] Conversely, the State contends that

---

[16]Morgan next argues that the district court erred in denying his separate motions for a mistrial based on testimony from two witnesses. However, after review of the record, we conclude that Morgan's argument lacks merit, and thus, the district court did not abuse its discretion in denying Morgan's motions. *See Domingues v. State*, 112 Nev. 683, 695, 917 P.2d 1364, 1373 (1996) (stating that this court will not disturb the district court's decision to deny a motion for a new trial absent an abuse of discretion).

[17]Morgan additionally argues that during closing argument, the State engaged in prosecutorial misconduct warranting reversal. After review of the record, we conclude that the alleged prosecutorial misconduct does not warrant reversal. *See Leonard v. State*, 117 Nev. 53, 81, 17 P.3d 397, 414 (2001) ("A prosecutor's comments should be considered in context, and a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." (internal quotation marks omitted)).

because Morgan misstated the facts, the district court did not abuse its discretion by demanding correction. We agree with the State and conclude that the district court acted within its discretion when it required Morgan to correct his misstatement of fact.

"[T]he right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process." *Herring v. New York*, 422 U.S. 853, 857 (1975). However, "[t]his is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained." *Id.* at 862. Accordingly, this court reviews a district court's "rulings respecting the latitude allowed counsel in closing arguments for an abuse of discretion." *Glover v. Eighth Judicial Dist. Court*, 125 Nev. 691, 704, 220 P.3d 684, 693 (2009) (internal citation omitted). A fundamental legal and ethical rule is that neither the prosecution nor the defense may argue facts not in evidence. *See id.* at 705, 220 P.3d at 694. "The trial court has an array of measures available to deal with improper argument by counsel." *Id.* at 702, 220 P.3d at 692.

Here, Maria never testified that she was still the manager of the convenience store at the time of trial. Because Morgan failed to elicit such testimony during cross-examination, the district court did not hinder his ability to participate in the adversary factfinding process by requiring him to correct his misstatement of fact. Therefore, the district court did not abuse its discretion and did not deny Morgan his right to effective assistance of counsel.[18]

---

[18]Because the court's action was appropriate, the district court further did not abuse its discretion by denying Morgan's motion for a mistrial based on his statement concerning Maria. *See Domingues v. State*, 112 Nev. 683,

SUPREME COURT
OF
NEVADA

(O) 1947A

*There was sufficient evidence for Morgan's conviction*

Morgan argues that there was insufficient evidence for his conviction because no merchandise was recovered and the State failed to present evidence that the convenience store was missing inventory. We disagree.

"The standard of review for sufficiency of the evidence in a criminal case is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution." *Jackson v. State*, 117 Nev. 116, 122, 17 P.3d 998, 1002 (2001) (internal quotation marks omitted). It is well established that the jury determines the weight of the evidence and credibility of the witnesses. *State v. Thompson*, 31 Nev. 209, 217, 101 P. 557, 560 (1909).

Here, testimony and surveillance video provided sufficient evidence to support the jury's verdict. First, Maria testified that she saw a man, whom she identified in open court as Morgan, put a package of mixed nuts into his pocket, and when she asked if he could please take the nuts out of his pocket, he cursed at her. Maria further testified that when she stepped back in response, Morgan approached and made her feel nervous before he hit her. In addition to the nuts, Maria testified that she saw Morgan conceal containers of soup in his backpack after reviewing the surveillance video and that at no time did he pay the cashier.

Second, an officer also identified Morgan in open court as the perpetrator and testified that he saw a package of mixed nuts fall out of

695, 917 P.2d 1364, 1373 (1996) (stating that this court will not disturb the district court's decision to deny a motion for a new trial absent an abuse of discretion).

 

Morgan's pocket when Morgan fell to the ground at the time of arrest. The officer further testified that he grabbed the nuts, despite the fact that they were never impounded.

Finally, surveillance video showed Morgan place a package of mixed nuts into his pocket. Video also showed Morgan place a container of red soup into his bag but place a container of yellow soup on the counter, showing that he only intended to pay for the container of yellow soup.

Although Morgan highlights the lack of recovered merchandise, the jury was properly instructed that the State was not required to recover or produce the proceeds of the alleged robbery at trial. Further, the surveillance video alone negated any need for the State to present evidence that the convenience store was missing inventory. Therefore, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of robbery and misdemeanor battery beyond a reasonable doubt. *See* NRS 200.380(1) (defining robbery as "the unlawful taking of personal property from the person of another, or in the person's presence, against his or her will, by means of force or violence or fear of injury . . . "); NRS 200.481(1)(a) (defining misdemeanor battery as "any willful and unlawful use of force or violence upon the person of another").

## *CONCLUSION*

We conclude that: (1) the district court did not err with respect to Morgan's competency hearing; (2) the district court did not err by rejecting Morgan's motion to dismiss the charges; (3) the district court did not commit structural error when Morgan moved to strike the jury venire; (4) Morgan was not entitled to a new venire; (5) the district court did not abuse its discretion in determining the manner in which voir dire was conducted; (6) the district court properly overruled Morgan's *Batson*

SUPREME COURT
OF
NEVADA

(O) 1947A

27

challenge, despite the fact that *Batson* applies to peremptory strikes based on sexual orientation; (7) the district court did not err with respect to closing arguments; and (8) there was sufficient evidence for Morgan's conviction. Based on the foregoing, we affirm Morgan's judgment of conviction.

_____, C.J.
Douglas

We concur:

_____, J.
Gibbons

_____, J.
Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A